**TEXAS DEPARTMENT OF TRANSPORTATION,**
Appellant,

v.

Mary G. ANDREWS, Individually, Mary Elizabeth Andrews Crockett, Individually, Kathryn Andrews Anderton, Individually, and Charley J. Andrews, III, Individually, and all as Representatives of the Estate of Charley Julius Andrews, Appellees.

No. 2–03–286–CV.

Court of Appeals of Texas, Fort Worth.

Sept. 23, 2004.

Rehearing En Banc Overruled Jan. 6, 2005.

Greg Abbott, Asst. Atty. Gen., Barry R. McBee, First Asst. Atty. Gen., Edward D. Burbach, Deputy Atty. Gen. for Litigation, Grady Click, Chief, Transportation Division Asst. Atty. Gen., Susan Desmarais Bonnen, Margarita Manzano Corbett, Ronald E. Garner, Asst. Atty. Generals, Austin, for Appellant.

Law Offices of Mallory & Sturns, Carl E. Mallory and Louis E. Sturns, Arlington, for Appellees.

Stradley & Wright, Edwin E. Wright, III, Thomas V. Murto, III, Dallas, for Amicus Curiae Austin Bridge and Road, Inc.

PANEL B: LIVINGSTON, DAUPHINOT, and WALKER, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### Introduction

Appellant, the Texas Department of Transportation (TXDOT), appeals from the trial court's order denying its plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(8), 101.001(3)(A) (Vernon Supp.2004–05). TXDOT contends that it is entitled to sovereign immunity from suit arising from a car accident on Highway 360. Appellees claim that the accident resulted from TXDOT's failure to place warning signs and properly maintain traffic control devices in the area of the accident. Because we conclude that appellees did not raise a fact question as to whether TXDOT's immunity from suit has been waived, we vacate the trial court's order denying TXDOT's plea to the juris-

diction and dismiss the claims against TXDOT.

## Background Facts

On October 30, 1999, appellee Mary G. Andrews and her husband, Charley Julius Andrews, were driving on Highway 360 when Mary drove onto a paved area (the "extension") that ended in a fifteen-foot drop-off. Their car went off the embankment, and Charley, the passenger, was injured in the resulting crash and later died.

Mary and the couple's children, Mary Elizabeth Andrews Crockett, Kathryn Andrews Anderton, and Charley J. Andrews, III—individually and as representatives of the Estate of Charley Julius Andrews—sued TXDOT for negligence.[1] Their claims fall into three general categories: (1) negligent design of the roadway and adjacent extension; (2) negligent failure to install and maintain appropriate traffic control devices before and around the extension to warn the public of the potential danger of the embankment; and (3) negligent failure to properly inspect and maintain the existing traffic control devices in the area after notice that they were inadequate. Appellees alleged specifically that the embankment is a special defect, and in the alternative, that it is a premise defect. TXDOT filed a plea to the jurisdiction alleging that it is entitled to sovereign immunity from suit, which the trial court denied. TXDOT filed this interlocutory appeal.

## Standard of Review

■ Sovereign immunity defeats a trial court's subject matter jurisdiction; thus, it is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26

(Tex.2004). When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts affirmatively demonstrating that the trial court has jurisdiction over the case. *Id.* at 226. We construe the pleadings liberally in favor of the plaintiffs and look to the pleader's intent. *Id.*

■ "[I]f a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* at 227; *Bland ISD v. Blue*, 34 S.W.3d 547, 555 (Tex.2000). If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea to the jurisdiction and leave its resolution to the fact finder. *Miranda*, 133 S.W.3d at 227–28. But "if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228. In other words, "after the state asserts and supports with evidence that the trial court lacks subject matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue." *Id.*

■■ We review the trial court's ruling on a plea to the jurisdiction de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex.2002). "When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant," indulging every reasonable inference and re-

---

1. Appellees also sued the contractor who constructed that portion of Highway 360.

solving any doubts in the nonmovant's favor. *Miranda*, 133 S.W.3d at 228.

Here, TXDOT challenged both appellees' pleadings and the existence of jurisdictional facts. Thus, we must examine the evidence submitted by the parties to determine if appellees raised a fact question regarding jurisdiction. *See id.*

### Analysis

■ Under the doctrine of sovereign immunity, the State and its agencies are generally immune from suit unless the State gives its consent to be sued. *Sipes v. City of Grapevine*, 146 S.W.3d 273, 278 (Tex.App.-Fort Worth 2004, no pet. h.); *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex.1997). The State, a governmental unit, is immune from both suit and liability for appellants' injuries unless its immunity is waived by the terms of the Texas Tort Claims Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021, 101.025 (Vernon 1997).

In their second amended petition, appellees claimed that the portion of Highway 360 where the accident occurred abruptly ends in a fifteen-foot embankment or drop-off. They claim that there were no "signs, barricades, or other markers" warning Mary or other motorists of this road condition. They further claim that the area was part of a "staged construction project" and that TXDOT breached a nondiscretionary duty to place and maintain traffic control devices in the area warning of the condition. Finally, appellees claim that TXDOT was negligent in failing to properly inspect the area and in failing to correct the absence or condition of traffic control devices in the area within a reasonable time after notice of the absence or condition of the devices. Thus, appellees' claims fall into two broad categories: (1) that the condition of the area where the fifteen-foot drop-off is located constitutes a special defect; and (2) in the alternative, the area is a premise defect for which TXDOT had a nondiscretionary duty to provide and maintain adequate warnings and traffic control devices. TXDOT challenged both categories of claims in its plea to the jurisdiction.

### Special Defect

■ The Tort Claims Act waives a governmental unit's immunity from suit and liability for violation of the duty to warn of special defects. TEX. CIV. PRAC. & REM.CODE ANN. § 101.060(c); *State v. Wollesen*, 93 S.W.3d 910, 913 (Tex.App.-Austin 2002, no pet.). A special defect is a condition of the same kind or class as "excavations or obstructions on highways, roads, or streets" that unexpectedly and physically impair a vehicle's ability to travel on the roadway, thus presenting an unusual and unexpected danger to users of roadways. TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b); *State v. Rodriguez*, 985 S.W.2d 83, 85 (Tex.1999); *Harris County v. Estate of Ciccia*, 125 S.W.3d 749, 753 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Whether a condition is a special defect is a question of law for the court. *Rodriguez*, 985 S.W.2d at 85; *Ciccia*, 125 S.W.3d at 753. To be a special defect, a condition must "be one which threatens normal users of a road even though such condition does not have to exist upon the surface of the roadway itself." *Morse v. State*, 905 S.W.2d 470, 475 (Tex.App.-Beaumont 1995, writ denied); *see Peterson v. City of Fort Worth*, 966 S.W.2d 773, 775 (Tex.App.-Fort Worth 1998, no pet.). A condition located so far from the roadway that vehicular passengers and other normal users of the roadway are unlikely to encounter it is not a special defect. *State Dep't of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 239 (Tex.1992) (op. on reh'g); *Morse*, 905 S.W.2d at 475. Further, "a special defect must be something

out of the ordinary course of events rather than a long-standard, routine, or permanent defect." *Villarreal v. State,* 810 S.W.2d 419, 422 (Tex.App.-Dallas 1991, writ denied); *see Peterson,* 966 S.W.2d at 776.

Here, TXDOT presented evidence that in the area where the accident occurred, Highway 360 does not end but instead gently curves to the right and transitions and becomes part of the frontage road. The embankment was located at the end of approximately 1,000 feet of paved area, the extension, that does not curve but goes straight ahead and is separated from the main roadway by a solid, four-inch-wide yellow striped line that follows the curve of the roadway to the right. The extension is not open to the public and was left as-is since 1992 to serve as a tie-in for a future addition to Highway 360. The extension does not have any roadway striping and, in contrast to the actual roadway, has no discoloration from traffic usage. Orange plastic barrels, or drums, also divide the extension from the roadway as it curves along the yellow line to the right.

The end of the extension itself is marked by a red and white barricade. Although it appears from photographs attached to the plea to the jurisdiction that the embankment at the end of the extension is not clearly visible from the beginning of the extension, the barricade is clearly visible. TXDOT also presented evidence that while the part of Highway 360 where the accident occurred is part of a "phased construction project," construction on this particular section was completed July 28, 1992 and approved by TXDOT August 7, 1992, seven years prior to this accident.

TXDOT contends that the embankment at the end of the extension is not a special defect because it would not be encountered by normal users of the roadway. Appellees contend they raised a fact issue regarding whether the extension was regularly used by motorists and not unintended for use by the public as TXDOT claims.

TXDOT presented an affidavit from Lewis Rhodes, an engineer, indicating that from 1992 to 1999 at least forty-seven million drivers had traveled past the roadway in the location of the accident. In that time, only one other accident had occurred at the same location, and it involved alcohol.

Appellees attached several deposition excerpts to their response to TXDOT's plea to the jurisdiction. One excerpt was from the deposition of Scott Peterson, a Euless police officer, who testified that police officers use the extension as a normal turnaround and that he uses it for that purpose probably ten times a day. He recalled another accident there involving a possible DWI and said he had heard of others, but no more than five. In another deposition excerpt, a witness to Mary and Charley's accident testified that the extension was "painted just like a regular road up to where it dropped off."

TXDOT contends that evidence of the volume of drivers passing by that location, the fact that only police officers routinely use the area, and that there have been only two to five accidents in that location, shows that the embankment at the end of the extension is not a condition encountered by normal users of the roadway. We agree.

The transportation code defines roadway as "the portion of a highway, other than the berm or shoulder, that is improved, designed, or ordinarily used for vehicular travel." TEX. TRANSP. CODE ANN. § 541.302(11) (Vernon 1999).[2] While a wit-

---

**2.** A highway is defined as "the width between the boundary lines of a publicly maintained

ness to the accident indicated in deposition testimony that the extension was marked like a highway to where it dropped off, appellees presented no evidence disputing the existence of the yellow line, right-hand side road delineators, and barricade. Even if evidence that police officers used the extension as a turnaround shows some "normal use" of the extension, that normal use is limited to turning around; thus, the embankment would never be encountered by a person using the extension for that purpose. Further, TXDOT produced evidence showing that the condition of the roadway at the time of the accident conformed to TXDOT's original design and had not been changed since the roadway had been completed in 1992. *See Villarreal*, 810 S.W.2d at 422.

Viewing the evidence in the light most favorable to appellees, we conclude as a matter of law that the embankment is not a special defect.[3]

**Premise Defect**

 In addition to claiming that the embankment is a special defect, appellees further contend that the embankment is a premise defect for which TXDOT is liable. A governmental entity's liability for a premise defect that is not a special defect is limited. Immunity is not waived for premise defects that arise out of the governmental entity's performance or nonperformance of discretionary functions. TEX. CIV. PRAC. & REM.CODE ANN. § 101.056; *Sipes*, 146 S.W.3d at 279. More specifically, the Tort Claims Act does not waive sovereign immunity for

(1) the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit; or

(2) the absence, condition, or malfunction of a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction is not corrected by the responsible governmental unit within a reasonable time after notice; or

(3) the removal or destruction of a traffic or road sign, signal, or warning device by a third person unless the governmental unit fails to correct the removal or destruction within a reasonable time after actual notice.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.060(a); *Rodriguez*, 985 S.W.2d at 85.

Because roadway design is a discretionary function, sovereign immunity is not waived for flawed roadway design. *Rodriguez*, 985 S.W.2d at 85; *Ciccia*, 125 S.W.3d at 753. The installation of safety features, such as barricades and signs, is part of a governmental unit's discretionary roadway design. *State v. Miguel*, 2 S.W.3d 249, 251 (Tex.1999); *City of El Paso v. Ayoub*, 787 S.W.2d 553, 554 (Tex.App.-El Paso 1990, writ denied) (holding that design, placement, and upgrading of barricades is an exercise of discretionary power).

TXDOT contends in its appeal that the trial court erred in dismissing its plea to the jurisdiction because appellees' claims attempt to hold TXDOT liable for performing discretionary activities. Appellees claim that TXDOT failed to comply with a nondiscretionary duty to provide certain warn-

---

way any part of which is open to the public for vehicular travel." *Id.* § 541.302(5).

**3.** Appellees provided evidence raising a fact question as to the placement and number of barrels between the extension and the roadway at the time of the accident. Even taking as true the evidence that there were only two

barrels placed far enough apart for a car to travel through, we conclude that, in light of the yellow line and barricade, the distance between the roadway and the embankment, and that the condition of the extension is of a longstanding nature, the embankment does not constitute a special defect.

ings in accordance with the federal and state Manuals on Uniform Traffic Control Devices and the State Department of Highways Barricade and Construction Standards.

*Texas Manual on Uniform Traffic Control Devices*

 Appellees and the dissent claim that, although roadway design is generally a discretionary activity, TXDOT failed to comply with the Texas Manual on Uniform Traffic Control Devices, which requires the use of certain warning signs and other traffic control devices for dangers such as the embankment. Appellees claim this duty is nondiscretionary. The dissent incorrectly implies that compliance with the Texas Manual is mandatory, and is therefore nondiscretionary. But the Texas Manual does not set legal standards for liability under the Tort Claims Act. *See State Dep't of Highways & Pub. Transp. v. King,* 808 S.W.2d 465, 466 (Tex.1991). The statute authorizing implementation of the Texas Manual indicates that TXDOT *may* implement the standards imposed therein. TEX. TRANSP. CODE ANN. § 544.002 (Vernon 1999). Thus, any decision by TXDOT to alter the warning devices set forth in the Texas Manual was discretionary. *See id.; King,* 808 S.W.2d at 466. We hold that any alleged failure by TXDOT to comply with the Texas Manual on Uniform Traffic Control Devices did not result in a waiver of immunity under section 101.060(a)(1). TEX. CIV. PRAC. & REM. CODE ANN. § 101.060(a)(1). Additionally, because TXDOT's duty to comply with the Texas Manual is discretionary, the dissent has incorrectly characterized compliance under the manual as a mandatory duty. *See King,* 808 S.W.2d at 466.

*Federal Manual on Uniform Traffic Control Devices*

 Appellees also contend that TXDOT had a mandatory duty under the federal Manual on Uniform Traffic Control Devices to erect warning signs and barricades. However, appellees offered no evidence indicating that the federal manual imposed any mandatory duties on TXDOT.

The standards in the federal manual apply to "any highway project in which Federal highway funds participate." 23 C.F.R. § 655.603(a) (2004). Appellees presented evidence that federal highway funds were used in connection with the construction of the roadway and extension where the accident occurred. However, appellees presented no evidence showing that the roadway and extension do not conform to the standards set forth in the federal manual.

TXDOT presented excerpts from the federal manual. Section 1A.09 provides that "[t]his Manual describes the application of traffic control devices, but shall not be a legal requirement for their installation." Following that section, a subsection entitled "Guidance" states as follows:

> The decision to use a particular device at a particular location should be made on the basis of either an engineering study or the application of engineering judgment. Thus, while this Manual provides Standards, Guidance, and Options for design and application of traffic control devices, this Manual should not be considered a substitute for engineering judgment.

The appellees attached to their response to TXDOT's plea to the jurisdiction excerpts from the federal manual. The excerpt regarding warning signs states that "[t]he determination of the sign or signs to be erected shall be on the basis of an engineering study using the following sections as guidelines." This indicates that the ultimate decision regarding placement of the signs is left to the discretion of the engineers.

Also attached to appellees' response is "Figure 6–2" from the federal manual, which depicts the placement of warning signs and barricades on a closed road with a detour, similar to the one at issue in this case. But, again, nothing indicates that the items shown on the diagram are mandatory. The title of the diagram is "Typical application of traffic control devices on a 2–lane highway where the entire roadway is closed and a bypass detour is provided." The excerpted page that discusses barricades and channeling devices indicates that barricades "*may* be used to mark" the end of a roadway and that "[t]raffic cones and tubular markers are *sometimes* used outside of construction and maintenance areas for general traffic control purposes." [Emphasis added.]

The excerpts provided by appellees do not show that TXDOT had a nondiscretionary duty to place certain warning signs and other traffic control devices in the area around the accident site; all decisions were to be made in accordance with engineering judgment. Accordingly, we conclude that any failure by TXDOT to comply with the federal Manual on Uniform Traffic Control Devices did not result in a waiver of immunity under section 101.060(a)(1). TEX. CIV. PRAC. & REM.CODE ANN. § 101.060(a)(1).

*Barricade and Construction Standards*

Finally, appellees contend that TXDOT had a mandatory duty to comply with, or force the contractor who built the road to comply with, the State Department of Highways and Transportation Barricade and Construction Standards, which they attached to their response. They claim the standards are incorporated into the construction contract between TXDOT and the contractor. However, appellees did not produce any portion of the contract or any other authority showing that either TXDOT or the contractor was required to abide by these standards. Furthermore, TXDOT presented deposition testimony from two TXDOT engineers indicating that the contractor completed construction of the project in accordance with the plans and specifications attached to the contract. Thus, we conclude that appellees did not raise a fact issue as to whether the standards imposed any mandatory duty on TXDOT.

*Absence or Removal of Traffic Signs, Signals, or Warning Devices*

Appellees also claim that TXDOT had a duty to maintain the barrels blocking the extension, that it was negligent in its inspection of the barrels, and that it failed to correct misalignment of the barrels within a reasonable time after notice. Appellees presented evidence that the barrels were frequently knocked apart and that perhaps only two barrels placed far enough apart for a car to drive through were present on the day of the accident. They also presented evidence that responsibility for placement of the barrels was a maintenance function for which TXDOT was responsible.

TXDOT presented an affidavit from the Assistant Maintenance Section Supervisor for TXDOT, who indicated that he and other TXDOT employees "regularly patrolled the area to check for barrels that may have been dislodged and to insure that general alignment was maintained." In addition, he stated that he had driven past the area between 8:00 and 9:00 a.m. on the morning of the accident and "observed that the delineation barrels were aligned and in place." He further stated that "[f]rom the Friday before to the Monday following the accident, no member of the public and no TXDOT employee is known to have observed or reported any dislodged barrel in the subject transition area."

Appellees presented evidence that TXDOT did not have a routine inspection policy regarding the barrels, only an informal inspection policy. A maintenance supervisor drove past the area every morning on his way to work and "hopefully he would notice" if the barrels were out of proper alignment. The dissent asserts that the majority's conclusion regarding this issue is based on disputed evidence because the condition and position of the barrels on the day Andrew's car entered the barricade were disputed. However, appellees presented no evidence that TXDOT knew the barrels were out of alignment on the day of the accident or that TXDOT did not follow its inspection policy on the day of the accident.

■ A governmental entity retains its immunity for decisions involving the negligent formulation of policy, but not the negligent implementation of policy. *See Mogayzel v. Tex. Dep't of Transp.*, 66 S.W.3d 459, 465 (Tex.App.-Fort Worth 2001, pet. denied). Thus, appellees cannot show that TXDOT's immunity has been waived with respect to the policy of inspection that it had in place regarding the barrels, whether informal or not. Furthermore, appellees presented no evidence showing that TXDOT did not follow the procedure that was in place.

Although appellees presented evidence indicating that the barrels were frequently knocked apart and had to be realigned, they presented no evidence raising a fact question as to whether TXDOT had notice that the barrels were out of alignment within a reasonable time before the accident. In addition, they presented no evi-

dence that the frequent misalignment of the barrels prevented them from performing their function of informing drivers at highway speeds not to enter the extension.[4] *See Lawson v. Estate of McDonald,* 524 S.W.2d 351, 356 (Tex.Civ.App.-Waco 1975, writ ref'd n.r.e.) (concluding that condition of traffic control device "refers to the maintenance of a sign or signal in a condition sufficient to properly perform the function of traffic control for which it is relied upon by the traveling public"). Thus, appellees failed to raise a fact question as to whether TXDOT's immunity under section 101.060(a)(2) had been waived. Tex. Civ. Prac. & Rem.Code Ann. § 101.060(a)(2). Because the appellees only raised issues of fact relating to formulation of the inspection policy and failed to present any evidence to raise a fact issue as to whether TXDOT failed to comply with that policy, the dissent has incorrectly characterized the majority's holding as an activity involving implementation of policy.

Because appellees failed to raise a fact question as to (1) whether TXDOT had a nondiscretionary duty to place and maintain warning signs and other traffic control devices in the accident area and (2) whether TXDOT had notice of the misalignment of the barrels within a reasonable time before the accident—and because we hold as a matter of law that the embankment at the end of the extension is not a special defect—we hold that the trial court erred in denying TXDOT's plea to the jurisdiction. We sustain TXDOT's issue on appeal.

4. Just as we do not believe that evidence that police officers used the extension as a "normal turnaround"—and that, out of approximately 47 million drivers passing that area between 1992 and 1999, two to five may have entered the extension and had accidents there—shows that the embankment constitut-

ed a danger to normal users of the roadway, we likewise do not believe that the same evidence raises a fact issue regarding whether any misalignment of the barrels prevented the barrels from performing their intended function.

## Conclusion

Having determined that the trial court erred in denying TXDOT's plea to the jurisdiction, we vacate the trial court's order and dismiss appellees' claims against TXDOT.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice, dissenting.

The majority holds that, although TXDOT undertook to install and maintain appropriate traffic control devices before and around the extension in question, it is immune from suit because this activity involves formulation of policy, not implementation of policy. I disagree.

In general, the courts of this state have held that decisions made at a policy level instead of an operational level are exempt as policy decisions.[1] The Supreme Court of Texas pointed out that the deciding question is whether the allegedly negligent conduct involves policy formulation or policy implementation.[2] That is because a governmental entity's negligent formulation of policy is immune from liability, while the negligent implementation of a policy will subject the entity to liability.[3] This rule corresponds to the rule that once a government has decided to perform a discretionary act, the act must be performed in a non-negligent manner.[4]

Whether a governmental entity's actions fall within its discretionary power is a question of law for the court to determine.[5] Texas courts are in agreement that "[m]aintenance activities undertaken at the operational level are not discretionary functions and are not immune from liability."[6]

The record before us reflects that sections 3F-1 and 6C-8 of the Texas Manual on Uniform Traffic Control Devices require that type III barricades, consisting of three horizontal rails with appropriate markings used to control traffic, be used in the following situations:

1. Roadway ends in a dead end or cul-de-sac with no outlet.

2. A ramp or lane closed for operational purposes.

3. The permanent or semipermanent closure or termination of a roadway.

Drums or barrels, on the other hand, are typically channeling devices used to direct traffic into the appropriate lane.

Nonetheless, TXDOT chose to block the closed roadway with drums, not barricades. Afterward, TXDOT's daily maintenance and inspection of the drums, which they admit is required, consisted of hoping the maintenance supervisor would notice the placement of the drums on his way to work. TXDOT's reason for the necessity of a daily inspection was that it expected some of the drums to get damaged and knocked apart frequently.

Mark Schluter, an area engineer for TXDOT, testified:

1. *McKinney v. City of Gainesville*, 814 S.W.2d 862, 866 (Tex.App.-Fort Worth 1991, no writ).

2. *State v. Terrell*, 588 S.W.2d 784, 787 (Tex. 1979).

3. *Alvarado v. City of Brownsville*, 865 S.W.2d 148, 156 (Tex.App.-Corpus Christi 1993), *rev'd on other grounds*, 897 S.W.2d 750 (Tex.1995).

4. *Norton v. Brazos County*, 640 S.W.2d 690, 693 (Tex.App.-Houston [14th Dist.] 1982, no writ).

5. *McKinney*, 814 S.W.2d at 867.

6. *Mitchell v. City of Dallas*, 855 S.W.2d 741, 745 (Tex.App.-Dallas 1993), *aff'd*, 870 S.W.2d 21 (Tex.1994).

Q. Okay. But the reason you inspect them every day is because you expect some of them to get damaged and knocked apart and lost?

A. Yes, sir.

Q. All right. But yet on this roadway, even though you're only using channeling devices in a fifty-mile-an-hour interstate freeway system, there is no routine inspection to see that they are put back in alignment every day. Is that what you're telling the jury?

A. No, sir. Actually, the maintenance supervisor comes in every morning to work, so hopefully he would notice that.

Q. Well, I would like to hope that myself, sir, but what records do I have to show this jury that in fact it was done?

A. Don't have any.

Q. So it's just trust me, believe me, I love you? Is that it?

A. Yes, sir.

The condition and placement of the barrels at the time the Andrewses' car entered the extension was disputed. Eyewitness Michael Samuel Houston testified:

Q. Were you aware of the presence of barrels or barricades at—on 360 just at the part where the road transitions to the right?

A. Yes, at times—I don't know if they were there when this crash occurred or not.

Q. Okay.

A. But I know in the past I have seen barrels there—

Q. Okay.

A. —and possibly, you know—I do remember at one point, and I've driven this road since 1993 when I first moved here, maybe three barrels across with a rope across. On this day, I—there was no rope. There may have been a barrel or two, but I don't know. I can't tell you.

Q. Did you have the impression that the barrels were not in proper alignment on this particular day?

A. Oh, yeah.

Q. Okay.

A. Yeah, because the, the van just, you know, went straight up, up the hill there—

Marilyn Ruth Hall, who witnessed the Andrewses' entry into the extension and fall from the end of the pavement, testified:

Q. Did you see some barricades or some sort of device in the area where Ms. Andrews' vehicle went?

. . . .

A. There was two big sand barrels but they were spaced way far apart. They should have been spaced a lot closer together and there was a barricade at the end of the—I guess ramp, you would call it. And that was just like a goal post ramp, kind of.

Q. Did you actually see the sign at the end of the ramp?

A. There was no sign. There was the barricade

Q. You also indicated that you had mentioned to your daughter or someone prior to this accident, that this location is very confusing?

A. Yes.

Q. And tell us again, ma'am, the Judge and jury, why you feel like this particular location is confusing?

A. Well, just the way the road veers that way. It's—to me it's very confusing and I don't understand why they did it.

Q. Okay.

A. It's not marked good enough to keep people out of there.

The majority says that we should look only to the condition of the barricade at the end of the extension and not to the condition of the devices for preventing entry. I disagree, and, at best, the majority's conclusion is based on disputed evidence. The majority bases its position on TXDOT's argument that the injury occurred 1000 feet from the entrance to the extension. The Andrewses' contention is that part of the problem is that motor vehicles were not adequately protected from inadvertent entry into an uncompleted extension that ended in a fifteen-foot drop-off. The speed limit at the entry to the extension was fifty miles per hour. A car traveling at that speed would reach the end of the extension in approximately fifteen seconds. Allowing for braking time, the danger to a vehicle entering the extension was imminent.

Police Officer Scott Peterson testified:

Q. Okay. How many other vehicles, to your, your personal knowledge, have driven off the embankment, the concrete down into the dirt below?

A. I can only state one for sure—

Q. Okay.

A. —other accident that I have knowledge of that has happened there.

Q. Okay. Isn't it true that you've heard about a couple of more since the freeway opened?

A. I have heard of others, yes.

Q. Okay. And when you say others, would that be two or three or—

A. It's not a large number. I've heard from other officers that have made comments, not only in our city but by Fort Worth officers that work that area, that they have worked accidents, but they've never indicated a number or how many, and I haven't ever seen a report to reflect that.

Q. Okay. Based upon your general knowledge, would you say that that would be somewhere in the neighborhood of a couple or more to a maximum of five more vehicles that have driven off?

A. I would say—

MR. PEARCE: Objection to the form of the question. Subject to that, go ahead and answer.

A. I would say that would be an accurate assumption.

Q. Okay. An accurate reflection on the—what the import of these—the meaning of what these other officers have told you, even though you're not going to pin it down because you can't?

A. Right.

Certainly, based on the record before us, TXDOT did not establish immunity. Because there are disputed issues of fact regarding jurisdiction, the trial court did not err in denying TXDOT's plea to the jurisdiction. For these reasons, I must respectfully dissent from the majority's opinion. I would affirm the trial court's denial of TXDOT's plea to the jurisdiction and would hold that Appellees are entitled to their day in court.