

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-21-00087-CV

CALDWELL COUNTY, TEXAS, APPELLANT

V.

MCCOY GENFAN, INDIVIDUALLY AND VICKI GENFAN, ON BEHALF OF THE
ESTATE OF MARK GENFAN AND ALISIN GENFAN, APPELLEES

On Appeal from the 421st District Court
Caldwell County, Texas
Trial Court No. 19-0-143, Honorable Stephen Yelenosky, Presiding

September 22, 2021

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Caldwell County, Texas appeals from an interlocutory order denying its plea to the trial court's jurisdiction. It sought the dismissal of the wrongful death and survivors action initiated against it by McCoy Genfan, individually, and Vicki Genfan, on behalf of the estate of Mark and Alisin Genfan. The latter sued the County for purportedly failing to adequately warn against flood waters covering a road down which Mark and Alisin Genfan

drove on December 7, 2018.[1]  Apparently, their car was washed away, and they drowned. The claims sounded in negligence and premises liability.  The County invoked sovereign immunity and moved to dismiss the suit.  The trial court denied the motion upon hearing the arguments and considering the evidence presented.  We reverse.[2]

A plaintiff has the burden to affirmatively establish a trial court's jurisdiction. *Town of Shady Shores v. Swanson,* 590 S.W.3d 544, 550 (Tex. 2019).  Doing that includes the obligation to illustrate a governmental entity's immunity was waived.  *Id.* So, when the entity challenges jurisdiction, the court need not look only to the pleadings but also may consider evidence touching upon the subject.  *Id.*  Indeed, it must consider such evidence if necessary to resolve the jurisdictional issue, such as when jurisdiction and the merits intertwine.  *Id.*  Should the existence of jurisdictional facts be at issue (as opposed to simply questioning whether the pleadings alone illustrate jurisdiction), the standard of review mirrors that utilized when considering traditional motions for summary judgment; in other words, all the evidence is viewed in a light most favorable to the plaintiff.  *Id.*

Several procedural vehicles exist through which a trial court's jurisdiction may be attacked.  They include a plea to the jurisdiction and both a traditional and no evidence motion for summary judgment.  *Id.* at 551.  Furthermore, where the existence of jurisdiction and the underlying merits of the suit are intertwined, the evidence supporting jurisdiction and the merits is necessarily intertwined, too.  *Id.* at 552.  "Thus, when a challenge to jurisdiction that implicates the merits is properly made and supported,

---

[1] They lived near the creek, used the road over which it ran, knew its waters sometimes swelled over the road, and, according to McCoy, would not attempt a crossing when the water level was high.

[2] Because this appeal was transferred from the Third Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

whether by a plea to the jurisdiction or by a traditional or no-evidence motion for summary judgment, the plaintiff will be required to present sufficient evidence on the merits of her claims to create a genuine issue of material fact." *Id.* Finally, should the evidence of record illustrate the presence of a material issue of fact regarding jurisdiction, the pre-trial jurisdictional challenge must be denied and await later determination.

The County urged various grounds purporting to show why dismissal was warranted. One such ground concerned a governmental entity's response to an emergency. That is, statute waives a governmental entity's sovereign immunity in certain instances. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2) (stating that a governmental unit is liable for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law"). But the entity retains its immunity when, among other times, the claim asserted against it arises "from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others." *Id.* § 101.055(2).

The legislature did not define "emergency" when enacting § 101.055(2). Nevertheless, it has been assigned a broad meaning. *City of Houston v. Hussein*, No. 01-18-00683-CV, 2020 Tex. App. LEXIS 8965, at *19 (Tex. App.—Houston [1st Dist.] Nov. 19, 2020, pet. denied) (mem. op. on reh'g); *Zapata v. City of Gonzales*, No. 13-18-00065-CV, 2020 Tex. App. LEXIS 805, at *10 (Tex. App.—Corpus Christi Jan. 30, 2020,

3

no pet.) (mem. op.)    That the meaning has been held to encompass flooding is beyond question.  As noted by our Supreme Court in *City of San Antonio v. Hartman*, "[w]hile the statute certainly has been applied to traffic accidents, it has also been applied in other circumstances, and **at least twice to floods**."   *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672–73 (Tex. 2006) (emphasis added).

Here, the Genfans attempt to negate the application of § 101.055(2) in three ways. The first two concern the existence of an emergency.  Allegedly, the County failed to present evidence illustrating that it was responding to an emergency when placing signs to warn drivers of flooding over the roadway in question.  Whether or not the County had such a burden is unimportant, given the record at bar.  *See Quested v. City of Houston*, 440 S.W.3d 275, 284 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (op. on reh'g) (stating that the burden lay with the plaintiff to establish that the emergency exception did not apply); *see also City of San Antonio v. Hartman*, 201 S.W.3d at 672 (observing that because the Hartmans do not contend any law or ordinance governed the placement of barricades on Rigsby Avenue or the City's acts or omissions showed it did not care what happened to motorists, § 101.055(2) applied unless the Hartmans "presented some evidence that City employees were not reacting to an emergency situation").    In addressing those claims, we begin by considering allegations within the Genfans' live pleading.

Therein, they averred that: 1) "Caldwell County has several creek crossings that **become dangerous** when rain causes high-water to go over" them; 2) on "Friday, December 7th, heavy rain prompted Caldwell County to dispatch a team of workers assigned to close the roads where the water crossings were known to be high during

4

rainy weather"; 3) "[e]mails obtained from Caldwell County reveal that . . . at 9:41 a.m., . . . [the] Southeast River Road at the Morrison Creek crossing [the crossing over which the decedents drove] had been closed by County workers" due to high water; and 4) "[t]hese emails conclusively established actual knowledge on the part of Caldwell County that there was **an acute danger on the day in question** (December 7, 2018) **and the County needed to warn the public of that danger**." (Emphasis added). Supporting Genfans' own factual allegations is evidence that: 1) four inches of water will move some cars; 2) "storms" were coming to or were in the area and county employees were alerted to post warning signs at locations over which creek water crossed; 3) by the evening of December 7th, it already had been raining for many hours, if not all day; 4) the Morrison Creek was known to "come[] up quick" and become dangerous; 5) the point at which the creek crossed the road could have no water running across it but within 30 to 40 minutes "it will be over four foot high going across that intersection"; 6) the County began closing roads on the day in question from "7" to "3"; 7) the Southeast River Road crossing was closed at 9:41 a.m.; 8) County personnel had viewed that particular crossing about an hour earlier and erected a sign with the warning ""Danger High Water"; 9) those personnel returned by 9:41 a.m. to discover that the water had risen to a level "too high for a vehicle"; 10) those employees determined that the crossing "needed to be closed"; and 11) the creek was running four to five feet deep over the road later that afternoon.

Section 101.055(2) concerns a governmental entity's reaction "to an emergency *situation*." *City of San Antonio v. Hartman*, 201 S.W.3d at 673. Whether an emergency presented itself generally implicates a question of fact. *Durham v. Bowie County*, 135 S.W.3d 294, 299 (Tex. App.—Texarkana 2004, pet. denied). Yet, there may be instances

when the evidence is so clear and uncontroverted that the answer may be determined as a matter of law. *See, e.g.*, *City of San Antonio v. Hartman*, 201 S.W.3d at 673 (stating that while there may be "some fact [tangential] questions here . . . . There [was] no fact question whether the City was reacting to an emergency situation" and "an emergency situation existed as a matter of law"); *Durham*, 135 S.W.3d at 299 (holding that "the first requirement of the statute [was] satisfied in that the evidence conclusively demonstrate[d] Bowie County was reacting to an emergency situation at the time its employees placed the road closure signs February 16"). This is one such instance. The County was aware of storms in the area and the effect they could have on roads over which Morrison Creek crossed. Inches of water running across those particular roadways posed danger to vehicles, and the water level of that creek had a propensity to rise quickly. So, the County reacted to the danger by warning of the water and closing roads. The river crossing over which the decedents would later traverse was closed before the Genfans approached it due to water being "too high for a vehicle." That level eventually would rise to 4 or 5 feet. Viewing this evidence in a light favoring the Genfans leads us to conclude, as a matter of law, that the County was reacting to an emergency situation. It was attempting to ameliorate the immediate danger caused by creek waters flooding a road.

We reject the Genfans' proposition that because the County had time to prepare for the situation, it was not reacting to an emergency. Time to react does not necessarily make a situation any less of an emergency. Our Supreme Court observed as much in *Hartman* when it said "[t]he statute exempts governments reacting to an emergency *situation*, which necessarily includes prioritizing some risks over others." *City of San Antonio v. Hartman*, 201 S.W.3d at 673. Consequently, "evidence that the City had time

6

to do more at Rigsby Avenue is not evidence that the City was no longer reacting to an emergency situation." From that we recognize the appropriate focus to be the tenor of the situation; that is, did it pose an emergency. If it did, then § 101.055(2) encompasses the situation irrespective of the time available to prepare for the particular aspect of the situation that caused injury. For instance, the presence of a tornado on the ground and the havoc and destruction it causes is no less of an emergency simply because weather forecasters predicted its presence a day or two earlier. Similarly, seeing a hurricane aimed at a Galveston coastline days before it hits does not make the resulting developing floods brought by its wind and rain less of an emergency situation. The same is no less true of a dangerously and rapidly rising creek caused by a storm. There may be time to do more but once the storm appears and the creek starts its rise to a level threatening injury or death, the situation becomes an emergency. Irrespective of the steps taken by the County in response, the situation presented before the County determined the applicability of § 101.055(2), and the circumstances here were one of an emergency situation. *City of San Antonio v. Hartman*, 201 S.W.3d at 673 (holding that placing barricades in the road to warn travelers of widespread flooding across streets was a response to an emergency situation); *Durham*, 135 S.W.3d at 299 (holding that Bowie County's placement of warning signs at a chasm caused by storms and flooding constituted an emergency, as a matter of law); *City of Arlington v. Whitaker*, 977 S.W.2d 742, 743–44 (Tex. App.—Fort Worth 1998, pet. denied) (holding, as a matter of law, that the fire chief's decision to park his official vehicle across a road to block egress into four feet of water traversing the road was a response to an emergency situation).

7

Another way in which the Genfans tried to thwart application of the emergency exception was by contending that the response taken by the County was not "in compliance with the laws and ordinances applicable to emergency action." If it were not, then its conduct fell outside § 101.055(2). *See Durham*, 135 S.W.3d at 301 (reiterating that immunity is not waived so long as action taken complies with the laws and ordinances applicable to emergency action). And, according to the Genfans, the County failed to comply because the signs or barricades utilized by it failed to comport with the Texas Manual on Uniform Traffic Control Devices. Yet, as specified in the statute, the laws and ordinances in question must be applicable to "emergency action." The Genfans cite us to nothing in the Manual expressly stating that its provisions were intended to regulate an entity's response to an "emergency."[3] This is of import because "Section 101.055(2) was [not] intended to refer to a general law . . . that might touch on emergency situations." *Durham*, 135 S.W.3d at 301. It was intended to refer to laws and ordinances expressly governing such situations. Consequently, the *Durham* court held that "while the Manual [in question] is a 'law' or 'ordinance,' the asserted portions of [it] were not 'applicable to emergency action' within the meaning of Section 101.055(2)." *Id.* at 302. This result also comports with the general statement in *Tex. DOT v. Andrews*, 155 S.W.3d 351 (Tex. App.—Fort Worth 2004, pet. denied) wherein the court said that the Manual "does not set legal standards for liability under the Tort Claims Act." *Id.* at 359.

Indeed, we must remember that § 101.055(2) deals with emergencies. They involve dangerous circumstances necessitating immediate response. Should the

---

[3] On the other hand, they represent that the Manual's provision does not apply unless signage is used to warn of the emergency. Conceding its general inapplicability to an emergency situation if signage is not used seems rather contradictory to the notion that the Manual is "applicable to emergency action."

8

government personnel undertaking that response view it practical to utilize signage warning the public of the dangerous circumstance, it would be counterintuitive to require them to hesitate by first determining if their signs comport with specifications found in the Manual. We hesitate to require those responding to an emergency situation to first consult the Manual before undertaking measures to ameliorate the dangers posed to others.

Thus, we find solace in both the words of *Durham* and *Andrews.* The provisions of the Manual mentioned by the Genfans were not laws or ordinances "applicable to emergency actions."

One final note concerns the last caveat mentioned in § 101.055(2). It pertains to actions "taken with conscious indifference or reckless disregard for the safety of others." Those too fall outside the provision's scope. Proving such disregard and indifference requires evidence that the actor knew the relevant facts but did not care about the result. *City of San Antonio v. Hartman*, 201 S.W.3d at 672 n.19. No doubt, the County knew of the flooding or emergency. In response, it sent crews out to monitor the roads and close them if necessary. One crew went to the area where the decedents would eventually be swept away and saw that the water level did not necessitate an immediate road closure. Nevertheless, they placed sawhorses near the roadway warning of the high water. Soon they returned to discover the creek had risen to a level necessitating closure. That led them to turn the sawhorses in a manner revealing language that the road was closed. Whether the sawhorses were placed in the middle or side of the road was disputed. Undisputed, though, was that the County took precautionary measures in response to the emergency. The Genfans conceded as much in their live pleading when averring that

9

County employees "placed the [warning] sign on the side of the road - where they always placed it when the creek was too high to cross." Thus, the record negates, as a matter of law, any suggestion that the County knew the relevant facts (i.e., the flooding) but did not care about the result (i.e., the safety of others).

Viewing the evidence of record in a light most favorable to the Genfans, we conclude that it and the pleadings establish, as a matter of law, the applicability of § 101.055(2). The County retained its sovereign immunity. Consequently, the trial court erred in denying the County's plea to the jurisdiction. We reverse that decision, grant the plea, and dismiss, without prejudice, the Genfans' suit against Caldwell County.

Brian Quinn
Chief Justice