**TEXAS DEPARTMENT OF TRANSPORTATION,
Appellant,**

v.

**Jose Luis PERCHES, Sr. and Alma Delia Perches, Individually and on behalf of The Estate of Jose Luis Perches, Jr., Appellees.**

No. 13–10–00231–CV.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

March 24, 2011.

Lisa Marie McClain, Michael Ratliff, Asst, Attys. General, Austin, for Appellant.

Ricardo R. Godinez, Law Office of Ricardo R. Godinez, McAllen, for Appellees.

Before Chief Justice VALDEZ and Justices RODRIGUEZ and VELA.

## OPINION

Opinion by Chief Justice VALDEZ.

In this accelerated, interlocutory appeal, appellant, the Texas Department of Transportation ("TxDOT"), challenges the trial court's denial of a plea to the jurisdiction in favor of appellees, Jose Luis Perches Sr. and Alma Delia Perches, individually and on behalf of the estate of Jose Luis Perches Jr., deceased ("Perches"), in a premises-liability case brought under the Texas Tort Claims Act ("TTCA"). *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.001–.109 (Vernon 2005 & Supp.2010). By two issues, TxDOT argues that the trial court: (1) erred in denying the plea to the jurisdiction because the Percheses' claims fall within TxDOT's design-discretion immunity; and (2) lacked subject-matter jurisdiction to issue a permanent injunction to close a state highway. We affirm.

## I. BACKGROUND

### A. The Bicentennial Underpass

The dispute in this case centers on the safety of the Bicentennial underpass located at U.S. Highway 83 and Bicentennial Street in McAllen, Texas. At approximately 3:45 a.m. on November 6, 2008, twenty-four-year-old Jose Jr. was killed when he crashed into a concrete barrier while attempting to make a left turn on the Bicentennial underpass, careened over the edge, and fell more than twenty feet to the roadway beneath.

The Bicentennial underpass consists of a ramp allowing access from the westbound lanes of U.S. Highway 83 to a bridge that traverses over the highway.[1] At the end of the ramp is a "T-intersection," which only allows westbound drivers exiting U.S. Highway 83 to turn left onto Bicentennial Street.[2] The underpass opened on No-

---

1. Jesus S. Leal, the Director of Transportation and Operations for the Pharr district of the Texas Department of Transportation, explained that the Bicentennial ramp and bridge is an underpass because the bridge "goes over the expressway." Leal further noted that an "overpass would be a bridge on the main lanes [of the expressway] that goes over a local street."

2. The Bicentennial bridge allows for drivers to travel in both directions—northbound and southbound—via two lanes in either direction. In addition, the bridge also includes space for biking and hiking.

vember 30, 1999, and TxDOT intended for the underpass to reduce congestion for those driving to the La Plaza Mall and the McAllen–Miller International Airport. Since its inception, several serious accidents have occurred on the underpass.[3]

## B. Jesus S. Leal's Deposition

Leal testified that, as Director of Transportation and Operations for TxDOT, he oversees, among other things, "all the traffic operations that consist of designing of signing, striping, traffic signals . . . ." Leal acknowledged that he participated in planning and implementing signage, striping, and traffic signals on the Bicentennial underpass. He recalled four automobile accidents that had transpired on the underpass and the remedial actions taken by TxDOT in response to the accidents. Leal remembered that the first accident occurred on an unknown date and involved an unidentified female. Apparently, the female was killed while driving on the underpass. The second accident occurred on January 1, 2005, and resulted in the death of the daughter of former Mission Chief of Police Leo Longoria. The third accident involved an unidentified male. And finally, the fourth accident involved Perches.

Leal testified that, after each accident on the underpass, TxDOT engaged in an investigation to determine what improvements could be made to the roadway to reduce the number of accidents. After the first accident, TxDOT added "supplemental signing and striping," including "some additional arrows on the pavement, the left-turn arrows up on the ramp on the approach" to warn drivers that they must turn left as they approached the "T-intersection."[4] After the second accident, TxDOT installed rumble strips—"little thermoplastic bars, probably about 18 inches in length and pretty good thickness at the highpoint, probably 3–to 500 mill[imeter]s"—at the bottom of the ramp. TxDOT also installed a "large warning sign with a 90–degree arrow turn and an advisory of 20 miles per hour speed as far as how to take the turn on the ramp up Bicentennial." The warning sign also had two flashers on top of the sign to warn drivers. In addition, TxDOT modified "the mast arm for the [traffic] signal" at the intersection to include "green arrows to further accentuate the fact that you need to go left." After the third accident, TxDOT further modified the traffic signal to include an additional green arrow directing drivers to turn left at the intersection, and it "added a second arrow board . . . north of the existing one," as an additional warning to drivers that they could only turn left at the intersection. The record does not reflect that the signage used by TxDOT indicated that the road ended at the "T-intersection." After Jose Luis Perches Jr.'s accident, TxDOT closed the ramp and repaired structural damage that was done to one of the concrete barriers. Leal noted that all of the accidents occurred between 12:00 a.m. and 4:00 a.m. and that TxDOT was considering closing the ramp and intersection during those hours or implementing a modified "cantilever arm" similar to those used at railroad crossings to prevent drivers from using the underpass during specified times.

---

**3.** In their appellate brief, the Percheses assert that "numerous, similar, serious auto crashes at the T-intersection on the top of the ramp" have occurred, "including 8 fatalities." However, in his deposition testimony, Leal recalled only four automobile accidents "or incidents that resulted in death" occurring on the underpass.

**4.** Leal later described TxDOT's efforts after the first accident as adding "those channelization signs that have the dual arrows saying that you must turn left on [sic] both lanes."

Leal also testified that after each accident, TxDOT consulted several engineering firms, including Brown & Gay Engineers, Inc., HDR Engineering, Inc. ("HDR"), TEDSI Infrastructure Group, Inc. f/k/a Traffic Engineering & Design Systems, Inc. ("TEDSI"), and Dannenbaum Engineering Corp. ("Dannenbaum"), to obtain expert guidance about how to make the underpass less prone to accidents. Furthermore, Leal stated the following regarding TxDOT's actions after each accident:

Q [Counsel for TxDOT]: So all of the signage that was originally in place and any subsequent signage, or pavement markings, or any kind of traffic advisory warning devices placed on the ramp were placed at the direction of engineers with the Texas Department of Transportation?

A [Leal]: Yes, sir, that's correct. That's a collaborative effort. And as a supervisor of the signal shop, I directed the signal shop to install those improvements and the warning signs, the flashing beacons, the arrow boards. I instructed the maintenance supervisor in conjunction with the area engineer at the area office and maintenance section.

All along the way, all these improvements were directed by a professional engineer and going out in the field and field verifying and using engineering judgment to make sure that those enhancements were put in the proper location and they were highly visible and conspicuous.

Q: That's what I asked you—was going to ask you. Was engineering judgment involved in this, or did maintenance just go out and haphazardly

stick a sign where they thought it ought to go?

A: No, sir. Most of the time if there was any question, we would physically go out in the field and tell them, "No, I want it moved over here instead of there."

Q: So the selection of the signs and the placement of the signs, selection of the striping, pavement markings, arrow board, traffic signal, all of that was done under the direction of engineering judgment?

A: Yes, sir.

Leal denied that the underpass was structurally unsound. He further denied that the signals and signage on the underpass had malfunctioned. He admitted that TxDOT was responsible for maintaining the signals because the underpass was a part of the freeway system.[5] Counsel for the Perches later asked Leal why different designs were not incorporated into the underpass to make it safer. In particular, the Percheses' counsel inquired why crash-cushion devices like "plastic barrels" or "cartridges," otherwise referred to as attenuators, were not used on the underpass, to which Leal responded that the City of McAllen objected to the attenuators interfering with the hiking and biking trail on the underpass and that the attenuators would protrude too much into the roadway. Finally, the Percheses' counsel asked Leal whether TxDOT was concerned about the safety of the underpass, which he responded as follows:

A [Leal]: Well, any time there is an incident, we certainly don't want to see that. We certainly want to make sure that whatever we have is safe for use.

5. Leal admitted that he was aware of a lawsuit brought in regard to the third accident at the Bicentennial underpass; however, he noted that the lawsuit did not name TxDOT as a responsible party.

. . . .

Q [Counsel for the Percheses]: Are they [TxDOT] concerned about the—as it sits there today—about that ramp? The safety of that ramp?

A: Well, you have to kind of look at it in context. I mean, we are certainly concerned with the safety of [the] traveling public using it. The facility is designed as intended. Of course, a lot of that is also dependent upon the user, the driver, and there is obviously some responsibility on the driver's side. We designed a structure facility to accommodate your normal prudent driver. I mean, your standard driver out there. It is designed to be safe in its form or fashion as a design basically.

. . . .

A: Like I said, after every incident we have always gone out to make sure everything was—nothing was— make sure everything was as it was designed and intended to be used for, and then looked at any potential modifications or adjustments as we saw fit. And we have done some through the years.

. . . .

Q: Is it fair to say, then, even after one death, after the first death, you went through that process?

A: Yes, sir, we go through that process every time.

Q: When you say "every time," every time there is a death?

A: Well, no, I mean any type of a concern. It doesn't have to be a death. It could be just another incident or it could be something we run across. Even the actual improvements that are there can get damaged through time. We have got to make sure those are upright and correct and up to standard. If there are any changes to standards, we update them.

## C. The Percheses' Expert

To counter the deposition testimony of Leal, the Percheses hired David C. Steitle, a professional engineer. Steitle executed an affidavit averring that he personally inspected the Bicentennial underpass and observed many problems. Steitle noted the following:

As a result of the design of U.S. Expressway 83 and the intersection of the Expressway westbound frontage road and the ramp to Bicentennial Boulevard, the left-exit ramp violates the expectancy of normal drivers expecting this ramp to be an entrance ramp to U.S. Expressway 83 westbound. Drivers who expect this to be an entrance ramp would be expected to accelerate from the posted speed of 45 mph on the frontage road in order to merge with expressway traffic. It is recognized in the traffic engineering profession that when driver expectancy is violated[,] car crashes will result. In addition, the vertical and horizontal profile of the ramp prevents drivers from seeing and recognizing that the ramp ends and does not continue through the intersection. This design deficiency creates an unsafe condition and does not properly warn westbound motorists that the Bicentennial ramp ends at the intersection of Expressway 83 and Bicentennial Boulevard.

The traffic[-]control devices originally designed and implemented for the Bicentennial ramp, as well as the traffic[-]control devices that that [sic] have been implemented since the original construction, are also deficient because they are confusing, conflicting, improper, and violate the Texas Manual on Uniform

Traffic Control Devices ("Texas MUTCD"). Specifically, the overhead guide sign for "McAllen–Miller [International] Airport" had a single downward pointing arrow over the left lane. Section 2E–18 of the Texas MUTCD requires that when such a sign is used "Downward pointing arrows shall be used only for overhead guide signs to prescribe lane assignment for traffic bound for a destination or route that can be reached only by being in the designated lane(s)." Since the sign was incorrect and the airport could be accessed from either the left or adjacent lane to the right, the sign infers that the adjacent lane to the right does not access the airport and could be reasonably expected to access the freeway.

In addition, the One–Direction Large Arrow signs pointing left at the end of the Bicentennial ramp violate the Texas MUTCD. Section 2C–09 of the Texas MUTCD states that Large Arrow Board Signs "shall be installed on the outside of the turn or curve in line with and at approximately a right angle to approaching traffic." The sign at the end of the Bicentennial ramp was not placed in line and at a right angle with approaching traffic because the ramp curves sharply to the left immediately before reaching the intersection. Further, because of the deficient design of the ramp, the Large Arrow Board signs do not come into the driver's view within sufficient distance to provide advance warning to drivers to perceive and react to conditions in the roadway, and improper and incorrect signage was used.

The Texas MUTCD also states that typical signs to be placed in advance of where a driver may have to stop are Stop Ahead, Yield Ahead, Signal Ahead, and Intersection Warning signs. If the

Signal Ahead Warning sign had been used, the sign could have then been preceded by the Be Prepared to Stop sign. Instead of the appropriate sign being used, a Turn sign with a 20 mph advisory speed was placed approximately 230 feet from the intersection. The Turn sign is intended to warn drivers that a turn in the road is ahead and that a recommended speed through a turn to the left is 20 mph. The Texas MUTCD states that these Turn signs are appropriate where a stop condition is not necessary. Therefore, in my opinion the wrong sign was used for the condition for which it was intended.

The deficient design of the ramp coupled with the confusing, conflicting[,] and improper traffic[-]control devices in violation of the Texas MUTCD was a contributing factor and a proximate cause of the crash and resulting death of Jose Luis Perches, Jr.

## D. Procedural Background

In their live pleading, the Percheses filed suit against TxDOT, Dannenbaum, TEDSI, and HDR, asserting causes of action for negligence, gross negligence, and wrongful death and survival.[6] Regarding TxDOT, the Percheses asserted that the TTCA, specifically sections 101.021(2), 101.022, and 101.060 of the civil practice and remedies code, waived TxDOT's sovereign immunity "for claims involving personal injury or death caused [by] the condition or use of personal[,] tangible[,] or real, and TexDOT, if it were a real person, is liable to Plaintiffs according to Texas law." *See id.* §§ 101.021(2), 101.022, 101.060. The Percheses further noted that "TexDOT's immunity is waived because Plaintiffs' damages were caused, in whole or in part, by the absence, condition, or

---

**6.** Dannenbaum, TEDSI, and HDR are not parties to this appeal.

malfunction of a traffic-control device and was not corrected by TexDOT within a reasonable time after it knew or should have known of the defective condition or malfunction, and the waiver of immunity is not exempted or excepted under the [TTCA]." With respect to their negligence cause of action against TxDOT, the Percheses alleged that "[a]t the time of the deadly collision made the basis of this lawsuit, the traffic signs, road signs and signal/warning devices on the roadways approaching and on the Bicentennial Ramp were incorrect, improper, improperly placed, confusing, and generally failed to function as intended" and that TxDOT:

> had actual and/or constructive notice of the faulty, improper, or defective condition of the signs, and tangible personal or real property in general, because of the inordinate amount of serious and deadly collisions that occurred at the location prior to the deadly collision made the basis of this lawsuit, all of which were subsequently investigated by TexDOT. However, Defendant Tex-DOT failed to take proper corrective action to make the Bicentennial Ramp safe by implementing proper traffic control devices and/or corrective action to the property in general, that would convey the proper and intended traffic[-]control information and function.

In addition to their causes of action, the Percheses applied for a permanent injunction, under section 65.011(1)-(3), (5) of the civil practice and remedies code and article I, section 19 of the Texas Constitution to enjoin TxDOT from re-opening the Bicentennial underpass. *See id.* § 65.011(1)-(3), (5) (Vernon 2008); *see also* TEX. CONST. art. 1, § 19. In particular, the Percheses noted that:

> If a permanent injunction is not granted, harm is imminent to Plaintiffs and the general motoring public because numerous prior injuries and deaths have occurred at the location as a proximate result of inadequate and unsafe design, construction, signage, and/or traffic and road control devices, including but not limited to the condition of the current signage and/or traffic and road control devices of the Bicentennial ramp violated the City of McAllen ordinances regarding such devises [sic], resulting in imminent harm to Plaintiffs and the motoring public in general if a permanent injunction is not issued. In addition, the harm that will result if a permanent injunction is not issued is irreparable because of the danger to Plaintiffs and the motoring public in general which likely will result in serious injury or death in the future.

TxDOT answered the Percheses' lawsuit and filed a plea to the jurisdiction, arguing that it was immune from liability because the Percheses' lawsuit complained about design decisions that TxDOT made regarding the Bicentennial underpass. TxDOT also contended that the Percheses cannot claim that TxDOT's immunity was waived for allegedly maintaining the underpass in a negligent manner. Finally, TxDOT asserted that: (1) the trial court lacked jurisdiction to issue a permanent injunction, forcing TxDOT to close the underpass, because the state highway system is governed by the Texas Highway Commission, not the judiciary; (2) the Percheses could not control State actions in the absence of legislative consent or statutory authorization; (3) there is no "implied private right of action for damages against governmental entities for violations of the Texas Constitution"; and (4) a party may not seek to enjoin the activities of a state agency but rather should sue an individual in authority at the state agency, which the Percheses did not do in this case.

In their first amended response to TxDOT's plea to the jurisdiction, the Percheses contended that TxDOT's immunity is waived because their claims: (1) are not "design-related" but rather arise under section 101.021(2) of the civil practice and remedies code; and (2) involved death caused by a traffic-control devices that were not functioning as intended, in accordance with section 101.060(a)(2) of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 101.021(2), 101.060(a)(2). The Percheses further argued that the trial court was empowered to grant a permanent injunction under article V, section 8 of the Texas Constitution, section 65.021(a) of the civil practice and remedies code, and section 34.007 of the government code; and that "suits against a governmental entity for violation of a constitutional right are not prohibited, nor does the entity retain immunity from suit merely because it is an injunction." *See id.* § 65.021(a) (Vernon 2008); *see also* TEX. CONST. art. V, § 8; TEX. GOV'T CODE ANN. § 24.007 (Vernon 2004).[7]

On March 16, 2010, the trial court conducted a hearing on TxDOT's plea to the jurisdiction. After considering the plea and all pleadings on file, the trial court denied TxDOT's plea to the jurisdiction and severed the Percheses' causes of action against TxDOT from the causes of action asserted against the remaining engineering firms. This accelerated, interlocutory appeal ensued. *See* TEX.R.APP. P.

28.1; *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(8) (Vernon 2008), 101.001(3)(B) (Vernon 2005).

## II. PLEA TO THE JURISDICTION

In its first issue, TxDOT argues that the Percheses' claims center on the "selection and placement of traffic signs and traffic[-]control devices," which fall within the "design discretion immunity" afforded TxDOT. TxDOT further argues that the MUTCD "provides standards for [the] design and application of traffic[-]control devices, but does not serve as a legal requirement for installation." Thus, any variations from the recommendations of the MUTCD do not create an actionable "condition of sign" claim under section 101.060 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.060. The Percheses respond that TxDOT's immunity was waived pursuant to section 101.060(a)(2) "because of the high number of crash incidents and deaths at the Ramp put TexDOT on notice of this condition which it ... failed to correct prior to the Plaintiff's [Percheses'] crash on November 6, 2008." *See id.* § 101.060(a)(2). The Percheses further contend that TxDOT failed to maintain existing traffic-control devices by not restriping the left turn arrows on the pavement and that the concrete barrier at the end of the "T-intersection" is a special defect under sections 101.021(2) and 101.022(b) of the civil practice and reme-

7. Section 65.021(a) of the civil practice and remedies code provides that "[t]he judge of a district or county court ... shall hear and determine applications for writs of injunction." TEX. CIV. PRAC. & REM.CODE ANN. § 65.021(a) (Vernon 2008). Section 24.007 of the government code states that a "district court has the jurisdiction provided by Article V, Section 8, of the Texas Constitution." TEX. GOV'T CODE ANN. § 24.007 (Vernon 2004). Article V, section 8 of the Texas Constitution provides, in relevant part, that: "District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body. District court judges shall have the power to issue writs necessary to enforce their jurisdiction." TEX. CONST. art. V, § 8.

dies code. *See id.* §§ 101.021(2), 101.022(b).

## A. Standard of Review

■ A plea to the jurisdiction is considered a dilatory plea, which challenges a trial court's authority to hear a cause of action without regard to the merits of the claim. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). The plea challenges the trial court's subject-matter jurisdiction. *Id.; see Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). Whether a trial court has subject-matter jurisdiction and whether the pleader has alleged facts that affirmatively demonstrate the trial court's subject-matter jurisdiction are questions of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004); *Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002).

■ The plaintiff has the burden to plead facts affirmatively showing that the trial court has jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993); *Univ. of N. Tex. v. Harvey,* 124 S.W.3d 216, 220 (Tex.App.-Fort Worth 2003, pet. denied). We construe the pleadings liberally in favor of the pleader, look to the pleader's intent, and accept as true the factual allegations contained in the pleadings. *See Miranda,* 133 S.W.3d at 226, 228; *City of Fort Worth v. Crockett,* 142 S.W.3d 550, 552 (Tex.App.-Fort Worth 2004, pet. denied). If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do, even those facts which may implicate the merits of the cause of action. *Miranda,* 133 S.W.3d at 227; *Blue,* 34 S.W.3d at 555 (confining evidentiary review to evi-

dence that is relevant to the jurisdictional issue); *see City of Waco v. Kirwan,* 298 S.W.3d 618, 622 (Tex.2009).

A trial court's review of a plea to the jurisdiction challenging the existence of jurisdictional facts mirrors that of a traditional motion for summary judgment. *Miranda,* 133 S.W.3d at 228; *see* TEX.R. CIV. P. 166a(c). The governmental unit is required to meet the summary judgment standard of proof for its assertion that the trial court lacks jurisdiction. *Miranda,* 133 S.W.3d at 228. Once the governmental unit meets its burden, the plaintiff is then required to show that there is a disputed material fact regarding the jurisdictional issue. *Id.* If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea to the jurisdiction and leave its resolution to the factfinder. *Id.* at 227–28. But, if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

"In considering this evidence, we 'take as true all evidence favorable to the nonmovant' and 'indulge every reasonable inference and resolve any doubts in the nonmovant's favor.'" *Kirwan,* 298 S.W.3d at 622 (quoting *Miranda,* 133 S.W.3d at 228). Further, a defendant cannot simply deny the existence of jurisdictional fact and force the plaintiff to raise a fact issue. *See Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 207 (Tex.2002); *see also County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002) ("In deciding a plea to the jurisdiction, a court may not weigh the claims' merits but must consider only the plaintiffs' pleadings and evidence pertinent to the jurisdictional inquiry.").

## B. Sovereign and Design–Discretion Immunity

■ Under the common law, sovereign or governmental immunity defeats a trial

court's subject-matter jurisdiction. *See Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex.2004). The TTCA provides a limited waiver of immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM.CODE ANN. § 101.021. For premise-defect claims, the governmental unit generally "owes to the claimant only the duty that a private person owes to a licensee," unless the claim involves special defects or "the duty to warn of the absence, condition, or malfunction of [traffic-control devices] as is required by Section 101.060." *Id.* § 101.022(a), (b).

However, there are certain exceptions to the waiver of immunity under the TTCA, including when a claim arises from:

(1) the failure of a governmental unit to perform an act that the unit is not required by law to perform; or

(2) a governmental units decision not to perform an act or . . . its failure to make a decision on the performance or nonperformance of an act if the law leaves the performance or nonperformance of the act to the discretion of the governmental unit.

*Id.* § 101.056. "In other words, the State remains immune from suits arising from its discretionary acts and omissions." *Tex. Dep't of Transp. v. Garza,* 70 S.W.3d 802, 806 (Tex.2002). Similarly, under section 101.060(a), the TTCA does not waive immunity for claims arising from the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit and the absence, condition, or malfunction of a traffic or road sign, signal, or warning device unless the absence, condition, or malfunction is not corrected by the respon-

sible governmental unit within a reasonable time after notice. *Id.* 101.060(a)(1)-(2). "Under subsection (a)(1), the State retains immunity for discretionary sign-placement decisions." *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez,* 82 S.W.3d 322, 326–27 (Tex.2002). "Under subsection (a)(2), the State retains immunity as long as it corrects a sign's defective [condition, absence, or malfunction] within a reasonable time after notice." *Id.*

**1. The Selection and Placement of Signage and Signals on the Underpass**

Here, the Percheses argue that TxDOT was negligent in maintaining the signage and signals on the Bicentennial underpass and that the signage and signals did not operate as intended. The Percheses further argue that the signage and signals conveyed the wrong traffic information and confused drivers, which led to numerous accidents on the underpass. In support of their arguments, the Percheses cite to Steitle's expert report, wherein he repeatedly alleges that TxDOT's placement of signage and signals on the underpass did not provide sufficient warning to drivers that they could only turn left onto the bridge, or in other words, the placement of the signage and signals was not adequate to warn drivers. In fact, Steitle noted that TxDOT's "design deficiency" of the underpass "violates the expectancy of normal drivers" and "creates an unsafe condition and does not properly warn westbound motorists that the Bicentennial ramp ends at the intersection of Expressway 83 and Bicentennial Boulevard." Steitle further suggests several alternative signs that TxDOT should have placed on the underpass to reduce drivers' confusion while traveling on the underpass. *See Siders v. State,* 970 S.W.2d 189, 193 (Tex.App.-Dallas 1998, pet. denied) ("Lights, signs, and safety features are part of a roadway de-

sign; therefore, the placement of stop signs and other safety features are discretionary in nature and cannot give rise to liability under the Tort Claims Act."); *Tex. Dep't of Transp. v. Ramirez*, 74 S.W.3d 864, 867 (Tex.2002) (holding that the TTCA does not waive sovereign immunity for roadway design).

■ Texas courts have held that the placement of signage and signals is a discretionary design decision and that the State retains immunity for such decisions. *See Gonzalez*, 82 S.W.3d at 326–27 (explaining that the State retains immunity for its decision relative to "where" signs should be located); *Johnson v. Tex. Dep't of Transp.*, 905 S.W.2d 394, 398 (Tex.App.-Austin 1995, no writ) (holding that the location of where to place a sign is a discretionary design decision). Moreover, in *City of Grapevine v. Sipes*, the Texas Supreme Court considered whether a city's failure to install a traffic signal, after deciding to do so, fell under the portion of section 101.060(a)(2) allowing claims to be brought under the TTCA when the absence of a traffic-control device is not remedied within a reasonable time after notice. 195 S.W.3d 689, 692–95 (Tex.2006). Construing section 101.060(a)(2) in light of section 101.060(a)(1), the court concluded that the timing of implementation is discretionary:

> *When* the City first installs a traffic signal · is no less discretionary than *whether* to install it. The timing of implementation could be affected by the governmental unit's balancing of funding priorities, scheduling, traffic patterns, or other matter; to impose liability for the failure to timely implement a discretionary decision could penalize a governmental unit for engaging in prudent planning and paralyze it from making safety-related decisions. This sort of planning and execution is precisely the type of

discretionary act for which the TTCA retains immunity. Thus, when subsections (a)(1) and (a)(2) are read together, (a)(2) logically applies only to those traffic signals that have already been installed.

*Id.* at 694 (emphasis in original); *see State v. San Miguel*, 2 S.W.3d 249, 251 (Tex. 1999) (per curiam) (interpreting section 101.056 and holding that a governmental unit's plans regarding the safety features of a roadway are discretionary). Thus, based on the foregoing case law, we reject Steitle's conclusions to the extent that he argues that TxDOT did not implement appropriate signage and signals within a reasonable time after each incident.

■ Steitle later asserts that TxDOT's immunity was waived because it failed to comply with the MUTCD in designing the underpass and in placing the signage and signals. Specifically, Steitle lists several instances where the signage and signals on the underpass do not explicitly comply with the MUTCD. We first note that compliance with the MUTCD's provisions is generally not mandatory. *See Brazoria County v. Van Gelder*, 304 S.W.3d 447, 454 (Tex.App.-Houston [14th Dist.] 2009, pet. denied); *Tex. Dep't of Transp. v. Andrews*, 155 S.W.3d 351, 359 (Tex.App.-Fort Worth 2004, pet. denied) (citing *State Dep't of Highways & Pub. Transp. v. King*, 808 S.W.2d 465, 466 (Tex.1991)); *Bellnoa v. City of Austin*, 894 S.W.2d 821, 824 (Tex. App.-Austin 1995, no writ). Moreover, Leal noted in his deposition testimony that TxDOT consulted with several engineering firms and exercised engineering judgment in determining where to place signs and signals on the underpass, though such placement may have deviated from the MUTCD. Because TxDOT exercised engineering judgment in the placement of the signage and signals and because the MUTCD's provisions are not mandatory,

we reject Steitle's assertion that TxDOT's immunity was waived for failing to comply with the MUTCD. *See State v. Rodriguez,* 985 S.W.2d 83, 86 (Tex.1999) ("The State's area engineer, Norrell, stated that when the accident occurred, his office had designed the existing warning signs according to his best engineering judgment. Thus, the State did not waive its immunity for warning signage."); *see also King,* 808 S.W.2d at 466; *Van Gelder,* 304 S.W.3d at 454; *Andrews,* 155 S.W.3d at 359; *Bellnoa,* 894 S.W.2d at 824.

**2. Negligent Implementation and Defective Conditions Under Section 101.060(a)(2)**

The Percheses also allege that TxDOT's use of confusing and misleading signage and signals constituted negligent implementation of TxDOT's policy to operate the Bicentennial underpass safely. They also argue that the signage and signals constituted defective conditions under section 101.060(a)(2) because they were "wrong, confusing, conflicting, and/or improperly placed." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.060(a)(2).

 A governmental unit is not immune from liability for an injury caused by a premise defect that was created through negligent implementation of policy. *See Mogayzel v. Tex. Dep't of Transp.,* 66 S.W.3d 459, 465–66 (Tex.App.-Fort Worth 2001, pet. denied). Further, a governmental unit's negligence in implementing a formulated policy is not a discretionary function. *See Mitchell v. City of Dallas,* 855 S.W.2d 741, 745 (Tex.App.-Dallas 1993), *aff'd,* 870 S.W.2d 21 (Tex.1994). "[S]overeign immunity is preserved for the negligent discretionary formulation of policy, but not for the negligent implementation of the policy at the [operational/ministerial] level." *Guadalupe–Blanco River Auth. v. Pitonyak,* 84 S.W.3d 326, 342 (Tex.App.-Corpus Christi 2002, no pet.). Further, a

governmental unit does not relinquish its discretion relative to roadway design by implementing a general policy to operate roads safely. *See Tarrant County Water Control & Improvement Dist. No. 1. v. Crossland,* 781 S.W.2d 427, 433 (Tex.App.-Fort Worth 1989, writ denied) (holding that the State's alleged policy to "warn of danger" did "not make the State liable for all possible failures to warn. The State may still make specific policy decisions about the design of State projects ..."), *overruled on other grounds by City of Dallas v. Mitchell,* 870 S.W.2d 21, 23 (Tex. 1994). "In other words, a general policy to build safe roads does not expose a governmental unit to liability for every conceivable safety deficiency under a negligent implementation of policy theory recovery." *Tex. Dep't of Transp. v. Olivares,* 316 S.W.3d 89, 100 (Tex.App.-Houston [14th Dist.] 2010, no pet.).

Furthermore, a "condition" under section 101.060(a)(2) is defined as "something 'wrong' with the traffic sign or signal such that it would require correction by the State after notice." *Garza,* 70 S.W.3d at 807; *see also Sparkman v. Maxwell,* 519 S.W.2d 852, 858 (Tex.1975) (defining "condition" as "either an intentional or an inadvertent state of being"). The term also "refers to the maintenance of a sign or signal in a condition sufficient to properly perform the function of traffic control for which it is relied upon by the traveling public." *Lawson v. McDonald's Estate,* 524 S.W.2d 351, 356 (Tex.Civ.App.-Waco 1975, writ ref'd n.r.e.). "[I]n the cases in which [the Texas Supreme Court] has interpreted 'condition' in the context of road signs and signals, [it has] found a waiver of immunity only in those situations in which the sign or signal was either (1) unable to convey the intended traffic control information, or (2) conveyed traffic control information other than what was intended."

*Garza,* 70 S.W.3d at 807; *see also Gonzalez,* 82 S.W.3d at 327 ("[S]ubsection 101.060(a)(2) requires the State to maintain traffic signs in a condition sufficient to perform their intended traffic-control function.").

In this case, the Percheses do not adequately explain how TxDOT's implementation of the signage and signals was negligent. Regardless, the Percheses' reference to their negligent implementation allegation in their live pleading implies that TxDOT's immunity was waived because it was negligent in implementing traffic-control devices to further its general policy to build and maintain safe roads, an allegation that Texas courts have held does not expose a governmental unit to liability. *See Olivares,* 316 S.W.3d at 100; *see also Crossland,* 781 S.W.2d at 433.

With regard to the Percheses' section 101.060(a)(2) contention, Leal testified that all of the signals and signage were functioning properly and clearly indicated that only a left turn could be made at the "T-intersection" by westbound drivers. Steitle did not opine that the signals and signage were malfunctioning; rather, he suggested that they did not properly warn motorists of the impending left turn because of TxDOT's placement of the signage and signals. In essence, the Percheses' contention that the signage and signals were confusing and misleading and, thus, constituted a "condition" under section 101.060(a)(2) implicates the adequacy of the devices chosen by TxDOT, a discretionary-design decision for which immunity is not waived. *See San Miguel,* 2 S.W.3d at 251 ("A court should not second-guess a governmental unit's decision about the type of marker or safety device that is most appropriate."); *Tex. Dep't of Transp. v. Bederka,* 36 S.W.3d 266, 271 (Tex.App.-Beaumont 2001, no pet.) ("Department

enjoys immunity from suit regarding its decision to place a particular traffic control signal, even if the signal fails to make the premises safe. The selection of the device employed is not its condition."), *overruled on other grounds by Sipes,* 195 S.W.3d 689; *see also Olivares,* 316 S.W.3d at 100–01.

**3. Negligent Maintenance of Existing Traffic–Control Devices**

Next, the Percheses contend that TxDOT failed to maintain existing traffic-control devices by failing to restripe left-turn arrows on the pavement. In support of their argument, the Percheses note that the left-turn arrows on the pavement had last been painted in 2005, more than three years before this incident. The Percheses also direct us to photographs attached to their appellate brief that apparently were taken on May 11, 2009, by their trial counsel, and demonstrated that some of the striping was faded.

■ We first note that these photographs were not formally included in the record and, thus, cannot be considered on appeal. *See Cantu v. Horany,* 195 S.W.3d 867, 870 (Tex.App.-Dallas 2006, no pet.) ("An appellate court cannot consider documents cited in a brief and attached as appendices if they are not formally included in the record on appeal."); *Till v. Thomas,* 10 S.W.3d 730, 733 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (same); *Pisharodi v. Saldana,* No. 13–09–00552–CV, 2011 WL 319810, at *3–4, 2011 Tex. App. LEXIS 582, at *12 (Tex.App.-Corpus Christi Jan. 27, 2011, no pet. h.) (mem.op.) (same). Moreover, these photographs were taken more than six months after Perches's death and do not appear to accurately depict the condition of the underpass's striping at the time of the accident. In addition, the Percheses do not direct us to any evidence in the record to suggest that the left-turn arrows on the pavement

were required to be restriped more frequently than every three years. Rather, Leal testified that the selection of striping required the exercise of engineering judgment on the part of TxDOT, which does not waive TxDOT's immunity. *See Rodriguez*, 985 S.W.2d at 86. Given the lack of competent evidence in the record addressing this contention, we cannot say that TxDOT negligently maintained the overpass by failing to restripe the left-turn arrows.

Based on the foregoing, we cannot say that the Percheses plead sufficient facts to affirmatively demonstrate that TxDOT waived immunity under the TTCA and that the trial court had jurisdiction with respect to the Percheses' ordinary premises liability claims. *See Miranda*, 133 S.W.3d at 227; *Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *see also Harvey*, 124 S.W.3d at 220. Nevertheless, the Percheses also alleged special defects claims, which warrant additional discussion.

## C. Special Defects Under Sections 101.021(2) and 101.022(b)

 Premises liability claims under the TTCA not only take the form of ordinary premises defects but also special defects. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.022; *see also City of Mission v. Cantu*, 89 S.W.3d 795, 807 (Tex.App.-Corpus Christi 2002, no pet.). The TTCA does not define "special defect," but section 101.022(b) "likens it to 'excavations or obstructions' that exist 'on' the roadway surface." *Denton County v. Beynon*, 283 S.W.3d 329, 331 (Tex.2009) (quoting TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b)). A special defect cannot be a condition that falls outside that class. *See Tex. Dep't of Transp. v. York*, 284 S.W.3d 844, 847 (Tex.2009); *see also Beynon*, 283 S.W.3d at 331–32 (noting that "a court cannot 'classify as "special"' a defect

that is not like an excavation or obstruction on a roadway.' ") (quoting *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 239 n. 3 (Tex.1992)).

 If a claim involves a special defect, the "State owes the same duty to warn as a private landowner owes to an invitee, one that requires the State 'to use ordinary care to protect an invitee from a dangerous condition of which the owner is or reasonably should be aware.' " *Beynon*, 283 S.W.3d at 331 (quoting *Payne*, 838 S.W.2d at 237). Actual knowledge is not required; the plaintiff need only prove the governmental unit should have known of a condition that created an unreasonably risk of harm. *York*, 284 S.W.3d at 847 (citing *Payne*, 838 S.W.2d at 237). The determination of whether a condition is a premises defect or a special defect is a question of law. *See id.*

In *York*, the supreme court described characteristics of this class that a court may consider in determining whether a condition of property is a special defect:

- Size of the dangerous condition. *See County of Harris v. Eaton*, 573 S.W.2d 177, 179 (Tex.1978) (finding a large hole six to ten inches deep and four to nine feet wide that covered 90% of the road's width was a special defect);
- Some unusual quality outside the ordinary course of events. *See City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex.2008) (finding a two-inch difference in elevation between traffic lanes on a roadway was not a special defect) (citing *City of Grapevine v. Roberts*, 946 S.W.2d 841, 843 (Tex.1997) (concluding that a partially cracked and crumbled sidewalk was not a special defect));
- Something that "unexpectedly and physically impair[s] a car's ability to travel on the road." *Rodriguez*, 985 S.W.2d at 85–86 (finding a ninety-de-

gree turn in a detour from a road construction project was not a special defect); and

- "An unexpected and unusual danger to ordinary users of roadways." *Payne*, 838 S.W.2d at 238 (finding a culvert beneath a roadway was not a special defect)

*York*, 284 S.W.3d at 847–48 (concluding that a layer of loose gravel on a road does not constitute an obstruction or excavation and, thus, is not a special defect).

Here, the Percheses allege that the concrete barrier placed at the end of the "T-intersection" constituted "a special defect for which TexDOT's immunity is waived." Leal testified that attenuators are not considered a part of traffic signage; rather, they are "more of a structural component." He further noted that attenuators often contain crash cushions and energy-absorption devices used to lessen the impact of collisions. Leal stated that TxDOT did not include any attenuators at the "T-intersection" because they would protrude into the lanes of traffic, especially considering the narrowness of the Bicentennial underpass, and because the City of McAllen did not want the attenuators to block the hiking and biking lane on the underpass bridge. A design schematic produced by Dannenbaum, designated as exhibit 4, clearly indicates that TxDOT's engineers highly recommended that attenuators be placed at the end of the ramp at the "T-intersection." The record also indicates that Brown & Gay recommended the implementation of attenuators at the "T-intersection." When asked why TxDOT refused to implement attenuators at the end of the ramp, Leal stated that:

> There is [sic] a couple issues with that. Those energy absorption devices were, at the time, we were really brainstorming to look at what could possibly be done. The reality of it was once we

started looking at the intent and the use for it, there really wasn't any such design to fit that configuration.

Most of the energy absorption devices that we use are usually on the blunt end of a barrier or a column protecting a point or a very identified specific area—contained area. And most of those, when you get into high speeds, normally require that you have a long bay in order to absorb that energy and dissipate that energy to get there.

Those are the standard designs that you run into when you do those type of things. In this particular instance, there was no such preset design. The fact that the barrier had a very short distance from a little buffer area in the travel lane didn't lend itself to have something—without hindering traffic and without hindering the southbound lane—protruding into the southbound lane to get enough dip in it to be able to have enough units to absorb the energy, especially at a high rate of speed, 70 miles an hour or so, there was no device designed for that particular brainstorming.

If there was to be a way to design something like this, how could it be done? And that's kind of the charge that the engineer had. And short of having to extend on the bridge to have enough base to absorb that energy without protruding into the lanes, made it a more difficult proposition to implement. In other words, you can't design something to stop you on a dime if you are going 70 miles per hour. You don't have the room.

Essentially, in his explanation as to why TxDOT did not implement any attenuators at the "T-intersection," Leal acknowledged that the design of the intersection is too narrow and that vehicles often drive on the ramp at high rates of speed. Therefore,

rather than widening the bridge or placing attenuators which could buffer and potentially lessen the impact of a collision occurring at the intersection, TxDOT, instead, chose to implement a concrete wall without any energy-absorption devices. As a result, more than four and possibly eight vehicles have contacted the unforgiving concrete barrier and plummeted more than twenty feet to the roadway underneath, resulting in certain death rather than minor property damage. Also, it is noteworthy that Leal admitted later in his testimony that he was not aware of any deaths occurring at the "T-intersection" by drivers travelling north and south over the bridge, demonstrating that all of the numerous deaths transpiring at this intersection have occurred as a result of the ramp, the narrow intersection, and the sharp left-turn required.

■ Based on our understanding of the design of the Bicentennial underpass, we believe that the concrete barrier at the "T-intersection" constitutes an obstruction within the meaning of section 101.022(b) because it impedes the ability of vehicles, which must accelerate to proceed up the underpass ramp, to make a safe left turn during the normal course of travel, especially considering the narrowness of the intersection. See TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b); see also Reyes v. City of Laredo, 335 S.W.3d 605, 607 (Tex.2010) (per curiam) (defining an "obstruction" as "an impediment or a hindrance"); Beynon, 283 S.W.3d at 332 (noting that the supreme court's special-defect jurisprudence turns on the objective expectations of an "ordinary user" who follows the "normal course of travel"); Rodriguez, 985 S.W.2d at 85–86 (noting that a special defect is something that "unexpectedly and physically impair[s] a car's ability to travel on the road").

In support of our conclusion, we find the First Court of Appeals' decision in *Harris County v. Estate of Ciccia* to be especially significant. 125 S.W.3d 749, 751 (Tex. App.-Houston [1st Dist.] 2003, pet. denied). In *Estate of Ciccia*, a car carrying several passengers crashed into a concrete culvert located at the end of an unfinished and unlit roadway, an accident which resulted in the death of one of the passengers. *Id.* at 751. The court described the roadway as follows:

As part of a capital improvement road project in Harris County, a median and several turn lanes were constructed on Barker–Cypress road near Keith Harrow Boulevard on what had previously been an undivided four-lane road. The engineering plans included a right-hand turn lane, intended to serve a proposed concrete plant, that was marked with striping, arrows, and the words "right turn only" on the road surface.

The lane was designed to turn into the driveway of the plant, but the plant was never built and no driveway was necessary. The designated right-hand turn lane remained, however, simply ending abruptly. At a later time, after this turn lane was constructed, the County permitted the telephone company to add a concrete culvert several yards beyond the end of the turn lane. This section of road was not lit; there were neither barricades nor signs to warn drivers that the road simply stopped short of a ditch containing a culvert.

*Id.* at 752. The pleadings alleged claims for negligent road design, premise defect, and special defect. *Id.* The First Court of Appeals concluded that the concrete culvert located beyond the end of the road onto which the "right turn only" lane directed traffic satisfied the definition of a special defect because it is an excavation or obstruction that unexpectedly and phys-

ically impaired the car's ability to travel on the roadway. *Id.* at 754–55. In particular, there was no signage or signal indicated that the road simply ended. Because the concrete culvert was determined to be a special defect and the county was aware of the dangerous condition, the county had a duty to warn of the special defect. *Id.* at 755. As a result, the First Court of Appeals affirmed the trial court's denial of Harris County's plea to the jurisdiction. *Id.*

Like the roadway in *Estate of Ciccia*, the ramp at the Bicentennial underpass abruptly ends. Moreover, the signage used by TxDOT merely indicates that westbound drivers should make a left turn at the intersection; it does not clearly indicate that the road ends at the ramp's "T-intersection." Further, the record does not describe the lighting at the "T-intersection"; however, it seems particularly important that all of the accidents at this intersection have occurred from midnight to 4:00 a.m., a time in which the lighting at the intersection may have been insufficient. Based on this, we, like the First Court of Appeals, are inclined to conclude that the concrete barrier constitutes a special defect which waives the governmental unit's immunity under section 101.022(b).

Moreover, the use of "T-intersections" at the end of exit ramps from highways where the posted speed limit is sixty miles per hour appears to be uncommon and constitutes an unexpected and unusual danger to ordinary users of roadways, especially considering the ramp's proximity to U.S. Highway 83 and the vertical incline, which requires drivers to accelerate to proceed up the ramp. *See York*, 284 S.W.3d at 847; *Payne*, 838 S.W.2d at 238; *see also Beynon*, 283 S.W.3d at 332 (explaining that the supreme court's special defects "case rest on the objective expectation of an 'ordinary user,' and such a driv-er would not be expect to career uncontrollably off the paved roadway"); *City of Weston v. Gaudette*, 287 S.W.3d 832, 837 (Tex.App.-Dallas 2009, no pet.) (same). Like *Beynon*, ordinary drivers driving on the Bicentennial underpass ramp approaching the "T-intersection" "would not be expected to career uncontrollably off the ... roadway" because of the narrowness of the intersection, the ending of the road at the "T-intersection," and the special defect—the minimal concrete barrier. *See Beynon*, 283 S.W.3d at 331–32 (" 'Whether on a road or near one,' conditions can be special defects like excavations or obstructions 'only if they pose a threat to the ordinary users of a particular roadway.' ") (quoting *Payne*, 838 S.W.2d at 238 n. 3).

Given the large number of fatal accidents that have occurred at the "T-intersection" during the underpass's brief existence, it is clear to this Court that the Bicentennial underpass is a dangerous roadway or "death trap"; that TxDOT was aware of the dangerous roadway; and that the concrete barrier at the end of the "T-intersection" constitutes a special defect, which impedes the ability of ordinary motorists to safely traverse the underpass during the normal course of travel. Because we have found that concrete barrier constitutes a special defect, we conclude that TxDOT's immunity was waived pursuant to section 101.022(b). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.022(b); *see also State Dep't of Highways & Pub. Transp. v. Kitchen*, 867 S.W.2d 784, 786 (Tex.1993) (per curiam) ("Absent a finding that the State knew of the dangerous condition prior to the accident, it is not liable to plaintiffs unless the condition was a special defect.") (citing *Payne*, 838 S.W.2d at 237); *City of Dallas v. Giraldo*, 262 S.W.3d 864, 869 (Tex.App.-Dallas 2008, no pet.) (noting that "[t]he Legislature has provided a limited waiver of immunity for premise defect and special defect claims

under the Texas Tort Claims Act" while citing to section 101.022 of the civil practice and remedies code).

Because we have concluded that the Percheses have pleaded sufficient facts to demonstrate that TxDOT's immunity was waived with respect to the Percheses' special defects claims, we conclude that the trial court did not err in denying TxDOT's plea to the jurisdiction. *See Miranda*, 133 S.W.3d at 227–28; *Tex. Ass'n of Bus.*, 852 S.W.2d at 446; *see also Harvey*, 124 S.W.3d at 220. We overrule TxDOT's first issue.

### III. PERMANENT INJUNCTION

In its second issue, TxDOT asserts that the trial court lacked subject-matter jurisdiction to grant the Percheses' request for injunctive relief, which resulted in the permanent closure of the Bicentennial underpass. However, the record does not reflect that the trial court ruled upon the Percheses' request for injunctive relief.

Texas Rule of Appellate Procedure 34.5(a)(5) requires that the "court's judgment or other order that is being appealed" be included in the clerk's record. TEX.R.APP. P. 34.5(a)(5). The only order included in the clerk's record is the trial court's denial of TxDOT's plea to the jurisdiction. It does not appear that the trial court entered an order granting a permanent injunction, thus enjoining TxDOT from operating the Bicentennial underpass; therefore, TxDOT's appellate complaint addressing the purported permanent injunction is premature or, in other words, not ripe for our review. *See Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex.1998) (noting that ripeness, like standing, is a threshold issue that implicated subject-matter jurisdiction and that the doctrinal purpose of ripeness is to prevent

premature adjudication); *see also Fulp v. Miller*, 286 S.W.3d 501, 513 (Tex.App.-Corpus Christi 2009, no pet.) (op. on reh'g) (same); *City of Weslaco v. Borne*, 210 S.W.3d 782, 787 (Tex.App.-Corpus Christi 2006, pet. denied) (same). Moreover, in its notice of accelerated appeal, TxDOT only mentions that it desired to appeal the trial court's March 29, 2010 order denying TxDOT's plea to the jurisdiction. *See* TEX.R.APP. P. 25.1(d)(2) (requiring appellant to file a notice of appeal stating, among other things, "the date of the judgment or order appealed from"). Because TxDOT's arguments pertaining to the purported permanent injunction are premature and because TxDOT specified in its accelerated notice of appeal that it desired to appeal only the trial court's March 29, 2010 order denying TxDOT's plea to the jurisdiction, we conclude that TxDOT failed to preserve its second issue for appeal.[8] *See* TEX.R.APP. P. 25.1(d)(2), 26.1 (providing that an appeal is perfected when a compliant notice of appeal is filed); *see also Parrish v. Rutherford*, 159 S.W.3d 114, 117 (Tex.App.-Corpus Christi 2004, no pet.) (holding that an issue was not preserved for appeal because appellants' notice of appeal failed to specify the order from which the purported issue arose).

### IV. CONCLUSION

Having concluded that the Percheses have pleaded sufficient jurisdictional facts to demonstrate that TxDOT's immunity was waived with respect to the their special-defects claims, we affirm the trial court's March 29, 2010 order denying TxDOT's plea to the jurisdiction.

---

8. Because TxDOT has not preserved this issue, we do not reach the merits of the permanent injunction.